## IN RE ESTATE OF AMY ANN PARKER.

**FRAUDULENT CONVEYANCES:** Fiduciary Relations. A presumption of fraud attends the transfer of property by a principal to his *confidential* agent, and especially when the principal is very aged and physically and mentally weak. Evidence held to render the presumption conclusive.

**EXECUTORS AND ADMINISTRATORS:** Enforcing Claims Against Administrator on Final Report. An administrator takes title in trust to every claim due to the testator at the time of his death, even though it be a claim for damages for fraud perpetrated on the testator *by the administrator himself*, before he became such, and he must voluntarily account therefor, or submit to an order for accounting by the probate court without a jury, on objections to his *final report*.

**EXECUTORS AND ADMINISTRATORS:** Waiver of Jury Trial. The act of qualifying as administrator works a legal waiver of right of trial by jury, in case claims in favor of the estate and against the administrator are sought to be enforced on objections to the administrator's final report.

**EXECUTORS AND ADMINISTRATORS:** Jury on Issue Arising on Final Report. An administrator may not complain that an issue arising on his final report was sent to a jury, when his only objection to such course was an untenable one.

**EXECUTORS AND ADMINISTRATORS:** Effect of Inquisitorial Examinations. The act of the probate court in calling the administrator into court and entering upon an inquisitorial examination as to the indebtedness of the administrator to the estate, does not exhaust the jurisdiction of the court, later, to enter upon a formal hearing of objections to the administrator's final report, and to adjudicate such indebtedness.

**LIMITATION OF ACTIONS:** Tolling Statute on Claims Due Estate from Administrator. The statute of limitations does not run during administration, on claims owed by an administrator to the estate.

*Appeal from Cerro Gordo District Court.*—JOSEPH J. CLARK, Judge.

OCTOBER 26, 1920.

EXCEPTIONS were taken to the executor's final report, and, on trial, the executor was ordered to turn over to the legatees, or their representatives, four shares of stock, of the par value of $1,000 each, in the J. Decker & Sons Company, $1,680 in dividends collected, with interest thereon, and a balance of $1,722.67 on four shares in said company, appropriated to his own use, with interest. The executor appeals.—*Affirmed.*

*Duncan Rule, E. P. Andrews,* and *Smith & Rinard,* for appellant.

*Blythe, Markley, Rule & Smith,* for appellees.

LADD, J.—I. Amy Ann Parker died testate, May 9, 1912, at the age of 90 or 91 years. She recited in her will that she was 86 years old, and a nephew testified that she was born April 16, 1821. She had so stated her age to Mrs. Schenke, and probably this is correct, though the executor, who prepared the will, thought she had said to him, some time prior to her death, that she was but 83 years of age. A. H. Cummings was nominated in the will to be executor, and, upon its admission to probate, September 9, 1912, was appointed as such by the court. He qualified, but did not file an inventory until February 7, 1914. During that year, a legatee filed an application for his removal, but this was never heard. The executor did not file report until October 11, 1917, and, about a month later, filed a substituted inventory, list of heirs, and description of the real estate. The final report was presented April 5, 1918. This last report showed cash on hand, after discharging all claims and costs, $500.05, and 60 shares of preferred stock in the Vulcan Iron Works Company, of Mason City, and 30 shares of its common stock issued to decedent and held by the executor, which he deposited with the clerk of court. The will, after directing payment of debts, and expenses of last

sickness and burial, gave Mrs. North, a niece, the home and furnishings, and to Mrs. North, George Fulford, and Thomas Buck, the residue of the estate. The latter had departed this life, and his son, John F. Buck, his daughter, Josephine Steward Fulford, the executor of the estate of Mrs. North, since deceased, and Henry Curbo, filed objections to this report, with amendments, alleging that the executor had failed to account for 8 shares of the stock, of the par value of $1,000 each, issued by Jacob E. Decker & Sons Company, and some other matters, which were subsequently abandoned.

It appears without dispute that, in 1907, decedent delivered to Cummings two notes, one for $4,500, and the other for $3,700, and directed him to dispose of them, and invest the proceeds in nontaxable securities; that he sold these notes at a small discount, and purchased 8 shares of stock heretofore mentioned, at par, in her name; and that, thereafter, until November 9, 1911, he collected the dividends declared thereon, and turned them over to Mrs. Parker. At the date last mentioned, when she was 89 years old, he claims to have exchanged 60 shares of preferred stock, of the par value of $100 each, in the Vulcan Iron Works Company, organized April 19, 1909, and 30 shares of its common stock, for the 8 shares of preferred stock in the Jacob E. Decker & Sons Company, paying a difference of $2,000, of which over $1,200 was charged for his services claimed to have been rendered, and some items he had advanced for her, and the balance in money. Whether such an exchange was made, is questioned; but, for the purposes of the case, such exchange may be conceded to have been physically effected. The objectors asserted that:

"(1) Either that said Amy Ann Parker was not mentally competent or capable of making said sale and assignment, or to make said settlement claimed by said Cummings; or (2) that, by reason of old age, feebleness of mind, and the business relations existing between her and the said Cummings, he took advantage of her, and by undue influence induced her to her disadvantage to sell

and exchange and transfer or assign said J. Decker & Sons [Company] stock to him, and to accept the payment and satisfaction and settlement claimed to have been made by him; or (3) that, whether she was mentally capable of transacting business or not, that, under the business relations existing between her and the said Cummings, he made misrepresentations to her in regard to the said stock and the Vulcan Iron Works stock, substantially as alleged by objectors, with intent to deceive and induce her to part with her said stock to him; that she believed and relied upon said statements, and was induced thereby to make the sale and exchange and transfer of said stock."

The executor, by demurrer, motion to strike, answer, motion to transfer to law side of calendar, and objections to further proceeding, raised, in substance, the following questions: (1) Whether the court had jurisdiction to determine the issues raised by the objections; (2) whether the fact that he appeared before the court for examination terminated the court's authority to pass on the objections to the final report; (3) whether, in sustaining the objections, the executor would be denied the right to trial by jury; (4) whether the issue as to fraud practiced on decedent might be heard in probate on objections to the final report; and (5) whether recovery should have been awarded on the merits.

II. Reference to the facts and conclusions to be drawn therefrom first will aid in a clear understanding of the issues raised. Cummings appears to have first acquired stock in the Vulcan Iron Works Company in July, 1909, by exchanging "an equity in a farm" and paying the difference in money, and with such stock, one half as many shares of common stock. He then occupied the same office as the president of the company's board of directors, and, in June, 1910, became a director and vice president of the board of directors. He was aware, at the time of the alleged exchange, that the company had never declared a dividend, and that it was in

1. FRAUDULENT CONVEYANCES: fiduciary relations.

pressing need of money. As early as June, 1911, the president, secretary, and treasurer were authorized to sell additional stock, to the amount of $25,000, on a commission not to exceed 10 per cent. At a stockholders' meeting on July 20, 1911, a motion was made that bonds in the sum of $25,000, bearing 7 per cent, be issued in lieu of the stock so authorized, and, four days later, a special meeting of the directors was called, and the issuance of the amount of bonds mentioned above ordered, on motion of Cummings, and a committee appointed to take the necessary legal steps. On September 11th of the same year, Cummings moved that the manager be authorized to negotiate a $1,500 loan on a house the company had taken for stock issued, in Saint Paul, Minnesota. He moved, on the same day, that the president and treasurer be authorized to issue $25,000 of preferred and $12,500 of common stock, over and above the original capitalization. In pursuance of an appointment July 20, 1911, a committee of three, appointed to audit the books, reported to the stockholders that the company was indebted to the banks in Mason City in the sum of $14,350; for merchandise, $5,200; accounts payable, $2,805.52; and a bond indebtedness of $7,000. On motion of Cummings, the board of directors resolved upon an issue of $25,000 in bonds. Knapp, the manager and its president, died early in 1913, and was found to have been indebted to it in money appropriated to his own use, in the sum of $10,000. Thereupon, its business ceased, without sufficient assets to satisfy indebtedness. Notwithstanding all this, Cummings insisted that he knew nothing of the affairs of the company, and that, at the time of the alleged deal with deceased, he supposed the shares of stock issued by the Vulcan Iron Works Company to be worth their par value. The evidence was such that he might well have been found to have been aware of the condition of the company, for he appears to have known it to be parting with its shares of stock for land, instead of cash, as exacted by law, and to have taken an active part in the meetings of the board of directors, as well as of the stockholders. From

his opportunities to know, and what he is shown to have done, the natural inference is that he was familiar with its financial affairs, and such a finding has ample support in the record.   That other men of business sagacity had acquired a small amount of stock of the company, and that the cashier or president of every bank of Mason City had written letters, purporting to be in response to an inquiry by its stock salesman, speaking well of the enterprise, cannot obviate the knowledge of its directors then or six months later, when the exchange was made, that the company was hard pressed for means, and in failing circumstances.   These letters but illustrate the readiness of some people to encourage others to invest liberally in building up "home enterprises," while holding fast to their own purse strings, or loosening but slightly!   Of course, a cautious business man would not be misled by cheap indorsements of this kind, by opinions merely, and probably of persons unfamiliar with actual conditions.   But what of the mass of investors, untrained in business, and seeking to safely place their funds?   Such letters are well calculated to lull these into a feeling of security, and to prevent adequate inquiry or investigation into the value of stock put on the market.   One of these who wrote of the enterprise in fine phrases testified:

"I did not have very much knowledge of the financial condition of the Vulcan Iron Works Company in 1910.   I made a very small investment in it, but do not recall the date.   It seemed to be necessary, under the suggestion of some of our people, that we ought to be helping these things along, and, like many others, I bought a little of it.   *   *   * I would not say the letter was a recommendation.   The first clause takes care of anything that might be said, if you read it.   I would not say that this letter I wrote was intended to mislead anybody to believe that stock in the Vulcan Iron Works Company was a fine investment, and I do not see how it could be misunderstood by any ordinary business man who used ordinary precaution."

But what of the unwary, those men and women with-

out ordinary business capacity? What were the letters written for? Manifestly, to aid the stock salesmen in disposing of the stock, and to be used in convincing people of its present value and earning capacity in the future. Can men of standing in the community afford to allow such standing to be frittered away on doubtful enterprises, to the injury or disadvantage of their neighbors? On the contrary, ought they not to be jealous of their good name, and never permit its use to mislead others to their detriment? Whatever the writers of these letters may have intended, Cummings, and men of his ilk, are not likely to have labored under any delusions because of their existence, for the record is indicative that he was fully aware of the embarrassments of the corporation,—at least, this is the inference to be drawn from the evidence adduced. That the shares in J. Decker & Sons Company, exchanged, were worth par value, and paid dividends regularly, is not questioned.

Cummings had been decedent's agent in the transaction of all her business since 1907. At the time of the deal, she was 90 years old, in feeble health, and, according to the testimony of two physicians and several nonexperts, of unsound mind. The evidence leaves no doubt that she intrusted all her business to his care, reposed in him absolute confidence, and exchanged the shares of stock at his suggestion, without inquiry and without knowledge of values. The shares of preferred and common stock in the Vulcan Iron Works Company alleged to have been received by her were worthless, while the 8 shares of the par value of $8,000 in the J. Decker & Sons Company were worth that amount. She was paid by Cummings only a difference of $2,000. The situation was such as to cast on him the burden to prove that the deal was fairly made, and on objectors, that she was of unsound mind. They met the burden of proof, but he failed to do so.

III. The decedent, then, had a cause of action against Cummings at the time of her death. All causes of action survive the death of those in whose favor they exist, and

2. EXECUTORS
AND ADMIN-
ISTRATORS:
enforcing
claims
against ad-
ministrator
on final
report.

may be prosecuted by personal representatives. Sections 3443 and 3445 of the Code. Title to that in favor of decedent then passed to the executor of her estate, upon his appointment and qualification. The executor, however, could not bring an action against himself. There is no statutory provision authorizing the prosecution of such an action by special or temporary administrator, or by the heirs. The only way open through which to contest his liability seems to be through objections to his final report as executor, or through his removal and the appointment of a successor, who may prosecute the action, as is the practice in some jurisdictions. At the common law, any indebtedness of an executor to the estate of his decedent was deemed satisfied upon his appointment, if nominated in the will, unless a contrary intent was manifest. This rule has never prevailed in this country. Here, his indebtedness becomes a part of the assets of the estate, and must be accounted for like other assets. *Savery v. Sypher*, 39 Iowa 675; *McEwen v. Fletcher*, 164 Iowa 517. In some jurisdictions, the debt is assumed to have been paid immediately upon becoming executor, and the amount becomes cash assets of the estate. Where courts indulge in this fiction, the indebtedness must be uncontroverted. *Shields v. Odell*, 27 Ohio St. 398. We see no reason to indulge in such a fiction. An executor ought not to be permitted, by virtue of his trust relation, to gain any advantage which he would not otherwise possess, with reference to his own indebtedness to the estate. *Coffey v. Coffey*, 193 Mass. 398; *Randall v. Turner*, 17 Ohio St. 262; *Baucus v. Stover*, 89 N. Y. 1; 2 Woerner on Administration (2d Ed.), Sections 311, 512. If insolvent when appointed, he ought not to be presumed to have paid something he did not have, and could not have paid. *Harker v. Irick*, 10 N. J. Eq. 269; *In re Piper's Estate*, 15 Pa. St. 533; *Lyon v. Osgood*, 58 Vt. 707; 2 Woerner on Administration (2d Ed.), Section 512. The denial of the right of an administrator *de bonis non* to

recover from the estate of the executor of the deceased predecessor on an indebtedness owed by said predecessor to decedent, is utterly inconsistent with the operation of the alleged fiction, and consistent with our conclusion that such a claim passes to the executor, like any other. *Hodge v. Hodge*, 90 Me. 505. We see no obstacle to treating the claim against the executor the same as those against others; for they should be subject to defenses of being unjust, or of having been satisfied or discharged, and to the plea of the statute of limitations. *Everts v. Everts*, 62 Barb. (N. Y.) 577, 582; *Black v. White*, 13 S. C. 37; *Wood v. Executors of Tallman*, 1 N. J. L. 153; *Lynch v. Divan*, 66 Wis. 490; *Dickie v. Dickie*, 80 Ala. 57. In the section of Woerner's Administration of Estates last above cited, that defense may be made by the executor, is said to be self-evident. The question was settled in *McEwen v. Fletcher*, 164 Iowa 517, at page 525. It seems to have been thought, in *Lynch v. Divan*, 66 Wis. 490, that issues raised by an executor may not be heard in probate, but that the proper practice is, when a defense is interposed, to remove the executor and appoint another in his stead, and that an administrator, by inventorying a claim against himself, "did not thereby admit that he owed the estate anything on account of either, or estop himself to deny his present indebtedness thereon. A defense to these claims has no proper place in the inventory. Whether he was the debtor of the estate on either account could only be determined in some legal proceeding appropriate to that end. Unless the county court was satisfied that the claims of the estate against the executor could not be enforced, it should have removed him, and appointed a competent administrator, who should have been required to bring suit against the late executor on the note and for the rent." But in *Wood v. Executors of Tallman*, 1 N. J. L. 153, 154, after noting the authority of the orphan's court of that state to compel an accounting, the court observed that:

"It has been strenuously argued that, although the orphan's court may compel executors to account for assets

or effects of the testator in their hands, yet they have no authority to try an action of debt; or, under pretence of citing an executor to account, to try a claim for a debt which he denies that he owes, or which he alleges he has paid. It has been said that, in this case, the executor is as much a stranger as any other debtor, and the orphan's court have no more right to adjudicate upon a claim against him by the testator, than upon a demand against any other individual. They allege that nothing is assets until recovered or reduced by the executors into actual possession, and proved to have come into his hands. But in this case, neither the bond nor the rents came to Woodward junior as executor; but, if they came to his hands at all, it was as a debtor; and these moneys cannot be charged to his account as executor, until they have been recovered by due course of law. These doctrines cannot be recognized by us, and they are contrary to the act of assembly. The law has given the orphan's court full power to compel the executors to account generally, and to decree the balance due to the legatees in their hands, without restraining them in the exercise of this power to any particular kinds of claims, or subjects of controversy. There is no real difference, as regards the executor, between assets in his hands, or a debt in his hands; it is, therefore, nothing more than an inquiry upon the subject of the inventory. All the argument turns upon the objection that the executor is thereby deprived of the benefit of a trial by jury; whereas, it is evident that, being both executor and debtor, no action could be instituted against him at common law, to try the validity of the claim. Unless he can sue himself, the remedy must be against him as accountant to the legatee, either in chancery or in the orphan's court, and in either case the trial by jury is equally out of his reach; by taking upon himself the *trust,* he knows he must *account,* and *volenti non fit injuria.* * * * It has been contended, also, that, if such a power be really granted to the orphan's court, it is unconstitutional, because the right to a jury is secured by that instrument to each individual of the

community. To this I answer: The Constitution does not extend the right to a trial by jury to cases which did not fall within its province before the existence of that charter. The chancery, prerogative, and spiritual courts have always proceeded without the intervention of a jury; and the orphans' courts, being invested with those powers as defined and limited by the act of assembly, may exercise them as before, without any violation of the right to trial by jury."

In *Everts v. Everts*, 62 Barb. (N. Y.) 577, the court, speaking of a claim against an executor, said:

"The executor is *prima facie* chargeable, but it is competent for him to show the claim unfounded and unjust. The validity or justice of the claim must, when denied, be in some way determined, and, as the executor cannot sue himself, and as the question must be settled before the estate can be finally settled, it must be tried in the surrogate's court, in the same way and for the same reason that claims against the estate in favor of the executor must be tried in that court. By trying in that court, the parties lose the benefit of a trial by jury; but that results from the voluntary act of the creditor in the one case, and the debtor in the other, accepting a trust which makes another mode of trial absolutely necessary."

The district court is given jurisdiction in probate matters, and especially of "the management and disposition of the property of and settlement of such estates." Section 225 of the Code. The executor is bound to "account for all the property inventoried at the price at which it was appraised, as well as for all other property coming into his hands belonging to the estate." Section 3395 of the Code. Under Code Section 3399:

· "Any person interested in the estate may attend upon the settlement of his accounts and contest the same."

The executor did not file his final report until April 5, 1918, over five years after his appointment, and does not appear to have referred to the Vulcan stock before filing his amended inventory in 1917. To this final report the

objections were interposed, as authorized by the statute last cited, and, as we think, the issues raised thereby were triable before the district court sitting in probate. The court is the same in issues arising at law, in equity, or in probate, but separate dockets are kept, as matter of convenience in distinguishing the one class of actions from the other. *Niemand v. Seemann,* 136 Iowa 713; *Tucker v. Stewart,* 121 Iowa 714. The practice is peculiar to each; and, though the issues raised by the objections to the final report must have been tried to a jury, had these been adjudicated in the lifetime of decedent, contests arising on final reports of administrators and executors are to be heard by the court without a jury. See *Duffy v. Duffy,* 114 Iowa 581. By accepting appointment as such, the executor acquiesced in the requirement that

3. EXECUTORS AND ADMINISTRATORS: waiver of jury trial.

he account to the court for all property held by him as such, and waived the right to trial by jury, to which otherwise he would have been entitled. This inevitably, follows from voluntarily putting himself in a situation where his liability to decedent could not be litigated, save on objections to his final report. Though the issues were

4. EXECUTORS AND ADMINISTRATORS: jury on issue arising on final report.

submitted to the jury, the executor is not in a situation to complain, for the cause was set down for trial to jury without objection thereto, save that the court was without jurisdiction to pass on the issues raised in objections to the final report.

IV. The executor filed his final report, as heretofore stated, and objections were interposed by those having an interest in any property to be distributed, praying that

5. EXECUTORS AND ADMINISTRATORS: effect of inquisitorial examinations.

"such report be not now allowed or approved until further investigation and report is had," and then praying that executor be cited to appear in court at a certain time for examination. An amendment to the objections was filed, specifically pointing out the objection, as heretofore made, to the report, and

declaring that the executor should be required to account for the eight shares of stock. On the same day, the executor appeared, and was examined in detail concerning the entire transaction. Under Section 3395 of the Code, he was required to account for all the property inventoried, at the price at which it was appraised, as well as all other property coming into his hands belonging to the estate. But examinations of this character are merely to aid in discovering the assets in the executor's possession or control, and, though bearing on the final settlement, it does not defeat the right, as contended by appellant, of "any person interested in the estate" to "attend upon the settlement of his accounts and contest the same." Section 3399 of the Code. The examination of the executor determined nothing; for he denied that decedent owned the stock in the Decker Company. The issues as to the ownership raised by the objections were not determined, and could not have been. Other witnesses might not have been called. Nothing in *Smyth v. Smyth,* 24 Iowa 491, and *Rickman v. Stanton,* 32 Iowa 134, is to the contrary. These decisions relate to a statute like Section 3315 of the Code, but, as pointed out in *Barto v. Harrison,* 138 Iowa 413:

"The proceeding authorized is inquisitorial in its nature, and designed especially as an economical and efficient mode of discovering property of the estate. The parties are not to be heard as on a trial. The person cited to appear only may be examined. The court or judge is not to try any issue of fact as to whether such person cited to appear is in the wrongful possession of property of the estate, but only to determine whether there is such an issue, and, if there is not, and the title is conceded to be in the estate, the order should be entered. * * * But if it develops in the examination that the title to the property is in dispute, or that there is some controversy as to whether the estate is entitled thereto, then the administrator or executor must be relegated to procedure usually resorted to in order to adjudicate such issues."

The testimony of the executor on citation did not con-

clusively establish his liability, or that he held the stock belonging to decedent in his possession as such executor, and, therefore, the court might not properly direct him to treat the property as that of decedent. The issues raised by the exceptions to the final report remained undisposed of, and were not affected by the executor's examination, save as this was introduced as evidence bearing on the issues raised by the objection to the final report.

V. The executor pleaded in bar the statute of limitations. Less than a year had elapsed after the deal complained of, when he became executor of her estate; and, as action might not have been maintained since, it is manifest that the period of five years fixed by Section 3447 of the Code had not expired. The indebtedness of himself as an individual was payable to himself in his fiduciary capacity. The statute of limitations does not apply in such a case. *Long v. Long*, 118 Md. 198 (84 Atl. 375). As remarked by Bleckley, C. J., in *Thompson v. Thompson*, 77 Ga. 692 (3 S. E. 261):

6. LIMITA-
TION OF
ACTIONS:
tolling stat-
ute on
claims due
estate from
administra-
tor.

"An examination of the authorities makes it clear to us that an administrator who is a debtor to the intestate individually or as surviving copartner, is chargeable as administrator with the amount of such debt; and that the statute of limitations will not protect him against account-ing for it, so long as he remains accountable for assets generally."

See, also, *Haines v. Haines' Exrs.* (N. J.), 15 Atl. 839; 18 Cyc. 230.

What we have said, disposes of other matters argued. We are content with the conclusion reached by the trial court, and the judgment is—*Affirmed.*

WEAVER, C. J., STEVENS and ARTHUR, JJ., concur.